## POSTED ON WEB SITE

FILED

DEC 2 1 2005

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 04-10912-B-7 |
| Keith A. Madkins, | |
|      Debtor. | |
| Charlotte Mannings, | |
|      Plaintiff, | Adversary Proc. No. 04-1129 |
|      v. | |
| Keith A. Madkins, | |
|      Defendant. | |

### MEMORANDUM DECISION AFTER TRIAL

Barbara McDaniel Harris, Esq., appeared on behalf of plaintiff, Charlotte Mannings ("Mannings").

Robert S. Williams, Esq., of Williams & Williams, Inc., appeared for defendant, Keith A. Madkins ("Madkins").

     In this adversary proceeding, Mannings seeks a determination that Madkins' debt to her, liquidated in the form of a default judgment from the Kern County Superior Court (the "Default Judgment"), is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(5) and (6).[1] Madkins is the debtor in the underlying chapter 7 case.

     This Memorandum Decision contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. The bankruptcy court has jurisdiction over this matter under 28 U.S.C. § 1334 and 11 U.S.C. § 523. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). For the reasons set forth below, judgment shall be entered in favor of Mannings on the conversion claim under § 523(a)(6) in the amount of $8,500. The

---

[1]Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., in effect at commencement of this bankruptcy case; prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

51

1 | remainder of the Default Judgment is dischargeable.

2 | **Findings of Fact.**

3 |     Madkins and Mannings are the biological parents of Shawnie,[2] who was four

4 | years old at the time of trial.[3] Madkins and Mannings are not and have never been

5 | married. In January 2002, Mannings filed an application with the Kern County

6 | Department of Child Support Services ("DCSS") to collect child support payments from

7 | Madkins. When Madkins was served with the pleadings from DCSS, he made an offer to

8 | let Shawnie, Mannings, and Mannings' three other children live in his home, and to pay

9 | one-half of their living expenses in lieu of further proceedings with DCSS. The

10 | arrangement was not reduced to writing, and the specific terms were not clearly defined.

11 |     From February 2002 until about July 13, 2002, Mannings, Shawnie, and the other

12 | children lived in Madkins' house. However, for some reason, Mannings did not close her

13 | case with the DCSS. On June 18, 2002, DCSS denied Mannings' application for child

14 | support because Mannings and Shawnie were living with Madkins and were therefore not

15 | eligible for that relief under California law.

16 |     Madkins did not live up to his end of the informal agreement. While Mannings

17 | was living in Madkins' house, Madkins told Mannings that he had not yet received his

18 | disability payments and he persuaded Mannings to pay many of the household expenses,

19 | including property taxes and energy bills. She also loaned Madkins money for other

20 | purposes, including household improvements, a car payment, repairs, and the purchase of

21 | new wheels for his car.

22 |     Mannings had a diamond ring which she obtained from Madkins sometime prior

23 | to the time she moved into the house. Madkins obtained possession of the diamond ring

24 |

25 |     [2]Mannings daughter's name is spelled Shawnee in the amended adversary
26 | proceeding. However, the court is using the spelling as set forth in the pleadings filed with the Kern County Superior Court.

27 |     [3]In November 2001, Madkins signed a declaration consenting to the
28 | establishment of paternity. A subsequent blood test confirmed that Madkins is Shawnie's biological father.

2

before Mannings moved out of the house in July 2002, and he sold it at a pawn shop in October 2002. Madkins also removed from his property a boat and trailer, which Mannings had paid for. Madkins purportedly sold the boat and trailer to a third party, but they were subsequently destroyed in a fire. On December 27, 2002, months after the boat and trailer were destroyed, Mannings obtained title certificates for the boat and trailer from the California Department of Motor Vehicles.

On July 30, 2002, Mannings went to State court to prosecute a newly filed domestic violence action against Madkins. On September 25, 2002, the State court issued a restraining order against Madkins which, *inter alia*, awarded custody of Shawnie to Mannings (the "Restraining Order"). In the Restraining Order, the court expressly restrained both Madkins and Mannings from disposing of the diamond ring, the boat, and the trailer:

> Mr. Madkins shall not dispose of, sell or otherwise get rid of the engagement ring for a period of 90 days from the date of this order and is subject to a civil action for Miss Mannings to recover.

> Mr. Madkins is to deliver to Miss Mannings the boat and trailer. She is not to dispose of, transfer or conceal for a period of 90 days until filing of civil action.

On December 5, 2002, Madkins brought a motion in the State court to set aside the above-referenced provisions of the Restraining Order. In that pleading, Madkins stated, under penalty of perjury, that he had sold the ring, boat and trailer in May 2002. However, Madkins attached to that pleading a copy of a receipt from a pawn shop dated October 8, 2002, about 13 days after the State court issued the Restraining Order. He also attached a typed document which suggested that he received $1,500 for the boat and trailer, from a third-party, in May 2002.

On November 6, 2002, Mannings filed a civil complaint against Madkins in Kern County Superior Court (case no. S-1500-CV-181052 - the "State Court Complaint"). The State Court Complaint sets forth three causes of action against Madkins, specifically: conversion damages totaling $8,500 for the diamond ring (alleged value $3,000), boat and trailer (alleged value $5,500) (first cause of action); breach of contract damages totaling

3

1  $9,208.78 based on money loaned to Madkins and his promise to help support Mannings

2  and her children (second cause of action); and fraud damages totaling $9,208.78 based on

3  misrepresentation regarding Madkins' disability payments (third cause of action).  The

4  State Court Complaint also prayed for recovery of attorney's fees in each cause of action,

5  in the amount of $2,137.50.

6      On December 3, 2003, the State court entered the Default Judgment against

7  Madkins in the amount of $17,663.78, plus attorney's fees in the amount of $2,137.50,

8  for a total debt of $19,801.28.  On its face, the Default Judgment simply awards damages

9  in the amounts prayed in the State Court Complaint.  The State court did not make any

10  findings of fact to support the Default Judgment.  Neither did the State court award

11  punitive damages nor allocate any of the Default Judgment to any particular claim for

12  relief.

13      Madkins filed for chapter 7 bankruptcy protection on February 5, 2004.  Mannings

14  timely filed this adversary proceeding to determine the dischargeability of Madkins' debt

15  under the Default Judgment.

16  **Issues Presented.**

17      Mannings contends that a portion of the Default Judgment in the amount of

18  $9,208.78 relating to the breach of contract and fraud claims is really in the nature of an

19  award for unpaid child support, and is nondischargeable under § 523(a)(5).[4]

20      Mannings further contends that a portion of the Default Judgment in the amount

21  of $8,500 is nondischargeable under § 523(a)(6), on the theory that Madkins willfully and

22  maliciously converted the diamond ring, the boat and the trailer.

23      Mannings contends that the portion of the Default Judgment in the amount of

24  $2,137.50 relating to attorney's fees is nondischargeable under § 523(a)(5), on the theory

27  [4]Mannings' original complaint prayed for relief under § 523(a)(2)(a) based on
alleged fraud.  The fraud claim was not pled with particularity and the court ordered
Mannings to file an amended complaint.  The amended complaint dropped the fraud
28  claim.

4

1    that such attorney's fees were incurred in the collection of unpaid child support.

2        Madkins disputes that Mannings is entitled to any relief.

3    **Analysis.**

4    **Collateral Estoppel Effect of the Default Judgment.**

5        Resolution of this dispute begins with an analysis of the Default Judgment, and its

6    effect, if any, on the issues now before the court. In other words, this court must decide,

7    based on the record in the State court and the Default Judgment, whether the State court

8    has already conclusively decided any of the material facts relevant to the claims or

9    defenses in this adversary proceeding.

10        Collateral estoppel, or issue preclusion, prevents parties from relitigating an issue

11    of fact or law if the same issue was determined in prior litigation. *See R.T.C. v. Keating*,

12    186 F.3d 1110, 1114 (9th Cir. 1999). Collateral estoppel is closely related to the doctrine

13    of res judicata, or claim preclusion, which operates as a bar to the maintenance of a

14    second suit between the same parties on the same cause of action. *See Kelly v. Vons Cos.*,

15    67 Cal. App. 4th 1329, 1335, 79 Cal. Rptr. 2d 763, 766 (Ct. App. 1998).

16        "Mutual" collateral estoppel involves subsequent litigation between the same

17    parties or their privies. It has the "dual purpose of protecting litigants from the burden of

18    relitigating an identical issue with the same party or his privy and of promoting judicial

19    economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439

20    U.S. 322, 326 (1979).

21        Collateral estoppel applies in bankruptcy dischargeability proceedings. *See*

22    *Grogan v. Garner*, 498 U.S. 279, 284 & n. 11 (1991). Under the federal Full faith and

23    Credit statute, federal courts must give state court judgments the same preclusive effect

24    that those judgments would receive from another court of the same state. 28 U.S.C. 1738.

25        California law thus determines the preclusive effect which this court must give to

26    the Default Judgment. California courts will apply collateral estoppel only if certain

27    threshold requirements have been met, and then only if application of issue preclusion

28    furthers the public policies underlying the doctrine. *Harmon v. Kobrin (In re Harmon)*,

5

250 F.3d 1240, 1245 (9ᵗʰ Cir. 2001) (citing *Lucido v. Superior. Ct.*, 51 Cal.3d 335, 341, 272 Cal. Rptr. 767 (1990)).

There are five threshold requirements which must be established before collateral estoppel of any issue will apply:

> First, the issue sought to be precluded from relitigation must be *identical* to that decided in a former proceeding.
>
> Second, this issue must have been *actually litigated* in the former proceeding.
>
> Third, it must have been *necessarily decided* in the former proceeding.
>
> Fourth, the decision in the former proceeding must be *final and on the merits*.
>
> Finally, the party against whom preclusion is sought must be the *same [party]* as, or in privity with, the party to the former proceeding.

*Lucido*, 51 Cal. 3d. at 341.

The public policies underlying collateral estoppel are (1) the preservation of the integrity of the judicial system, (2) promotion of judicial economy, and (3) the protection of litigants from harassment by vexatious litigation. *Id.* at 343.

The second and third requirement for collateral estoppel are interrelated. The second requirement, the "actually litigated" element, applies in the context of a default judgment, "'only where the record shows an express finding upon the allegation'" for which issue preclusion is sought. *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1124 (9ᵗʰ Cir. 2003), citing *Williams v. Williams (In re Williams' Estate)*, 36 Cal. 2d, 289, 297 (1950). However, the "express finding" requirement can be waived if the court in the prior proceeding necessarily decided the issue. *Cantrell*, 329 F.3d at 1124, citing *In re Harmon*, 250 F.3d at 1248. In such circumstances, an express finding is not required "if an issue was necessarily decided in a prior proceeding, it was actually litigated." *Id.* This court must therefore scrutinize each of the five requirements for collateral estoppel, specifically the first, second and third requirement, to determine what

1    issues, if any, have been decided in the Default Judgment.[5]

2         Applying these principals now to the Default Judgment, and the State court record

3    before the court, the State Court Complaint alleged both breach of contract and fraud and

4    the Default Judgment awarded damages in the amount prayed under both claims. Since

5    the Default Judgment did not include any punitive damages, this court cannot tell from

6    the Default Judgment, what theory and facts were necessarily litigated, breach of contract

7    or fraud; either theory would have supported the damage award. Of course, breach of

8    contract is not actionable under § 523 and Mannings dropped her fraud claim in this

9    adversary proceeding before going to trial. What is certain from the Default Judgment is

10   that the State court made no finding regarding any claim for spousal or child support.

11   Mannings did not sue Madkins for a child support award and this court cannot look to the

12   Default Judgment as preclusive of any issues relevant to Mannings' claim under §

13   523(a)(5).

14        The Default Judgment also includes damages in the amount prayed for conversion

15   of personal property. Since the State court awarded damages in the amount prayed on the

16   conversion claim, this court can conclude that the act of conversion and the value of the

17   diamond ring, boat and trailer, were necessarily litigated by the State court. Both of those

18   facts were necessary to support the Default Judgment. The Default Judgment makes no

19   other findings of fact regarding removal of the personal property, including Madkins'

20   specific motive or intent. Therefore, as discussed below, this court must look to other

21   evidence in the record to support those elements of Mannings' claim under § 523(a)(6).

22   **Mannings is Not Entitled to Relief Under 11 U.S.C. § 523(a)(5).**

23        The analysis of this case begins with a review of the applicable statute. 11 U.S.C.

24   § 523(a)(5) (effective prior to October 17, 2005) provides an exception to discharge for

25   any debt:

26

27        [5]There is no dispute concerning the fourth and fifth requirements for collateral
     estoppel. Madkins was the defendant in the State court action and the Default Judgment
28   is final on the merits because Madkins failed to appeal it.

7

**[T]o a spouse, former spouse, or child of the debtor**, for alimony to, maintenance for, **or support of such spouse or child**, in connection with a **separation agreement, divorce decree or other order of a court of record**, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement . . . . [Emphasis added.]

The party seeking a determination that a debt is nondischargeable bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

If any one of the requisite elements is not met, the debt is dischargeable. Courts generally construe the statutory exceptions to discharge in bankruptcy "liberally in favor of the debtor," and recognize that "'[t]he reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) (quoting *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934)).

Mannings contends that she and Madkins had a contractual agreement to provide support for Shawnie, and that her damages for breach of that contract, as reflected in the Default Judgment, are in the "nature of child support." The determination of whether an obligation is in the "nature of support" is a matter of federal law, not state law. *In re Gibson*, 103 B.R. 218 (9th Cir. BAP 1989). However, this court must turn to State law to determine whether there is a legal basis for the "child support" claim in the first place.

Looking first to Mannings as the party actually asserting the "child support" claim, the court notes that Mannings is not a "spouse or former spouse" of Madkins and is not a person described in § 523(a)(5) as being eligible for such relief. Since they were never married, there was no separation agreement, divorce decree, or order of the court awarding alimony or support in accordance with State law. To the extent that Madkins contracted to provide any shelter and living expenses for Mannings, that portion of his obligation under the Default Judgment is therefore not actionable under § 523(a)(5). Similarly, Madkins had no legal obligation to provide shelter and living expenses for any of Mannings' other three children, and that portion of his contractual obligation, as may be reflected in the Default Judgment is also dischargeable. That leaves only Madkins' obligation to provide child support for Shawnie, his biological daughter.

8

**Shawnie's Right to Child Support Was Not Perfected Under California Law
Because It Was Not Reduced to a Court Order.**

Mannings contends that she has standing under California law to enforce
Shawnie's claim for child support because Shawnie is a minor and Mannings is the
custodial parent. However, prior to the time Mannings moved out of Madkins' house in
July 2002, there had never been any judicial proceeding or court order requiring Madkins
to pay child support for Shawnie.[6] The State Court Complaint itself did not pray for a
child support award on behalf of Shawnie, and the State court made no such finding.

Mannings' claim on behalf of Shawnie suffers from a more fundamental problem;
a legal obligation for child support *must have accrued* under California law in order for §
523(a)(5) to apply. That, in turn, requires that there be a prior court decree for child
support. *Visness v. Contra Costa County* (*In re Visness*), 57 F.3d 775, 780 (9th Cir.
1995), *cert. denied*, 516 U.S. 1099 (1996) (concluding that support rights do not accrue in
favor of a child under California law until a court establishes the noncustodial parent's
support duty"). Under California law, "a parent cannot claim reimbursement for money
paid out in support of a child prior to an order of the court directing the other parent to
pay support . . . ." (citations omitted.) *In re Marriage of Goosmann*, 26 Cal.App.4th 838,
844 (1994).

Here, Mannings tried to get a court order for child support before making her
agreement to share the house with Madkins. However, by making that agreement, she
effectively waived the right to child support, at least for the duration of the agreement
itself. The DCSS denied Mannings' application for child support because she and
Shawnee were living with Madkins. Under the *Visness* decision, that would be the end of
Mannings' claim under § 523(a)(5).

Mannings contends that all of the money she advanced to Madkins for all

_____

[6]Mannings states in her pre-trial statement filed on May 9, 2005, that she
reinstated her case with DCSS on March 21, 2003, and that Madkins was subsequently
ordered, *for the first time*, to pay child support for Shawnie.

9

purposes, including car repairs, should be deemed to be "child support." Mannings argues in her post-trial brief that she and Madkins contractually agreed to establish a certain living standard for Shawnie, which included (1) payment for and maintenance of Madkins' vehicle "to meet [Shawnie's] needs," (2) repairs to Madkins' house, including paint, carpet, new flooring "to make the home more aesthetically suitable for [Shawnie]," and (3) payment of the property taxes on Madkins' house to assure "that the parties and their children could continue to occupy the home." She argues that funds were advanced or loaned to Madkins to finance these objectives as part of "modifications" of their original agreement. However, Mannings did not sue Madkins in State court for failure to provide child support; she sued him for breach of contract. She sued for *reimbursement of monies she had already paid*, including utility bills, real property taxes, and new wheels for Madkins' car. Mannings' effort to recharacterize her reimbursement claim, indeed all of her "contract damages," as being "in the nature of child support" is not supported by California law.

Mannings argues that this case is analogous to the facts in *de Guigne v. de Guigne (In re de Guigne)*, 97 Cal.App.4th 1353 (2002). In *de Guigne*, the parties had consensually established an opulent lifestyle for their children. In the parents' divorce proceedings, the trial court awarded child support in an amount that was three times greater than the accepted guidelines required, based on the particular lifestyle and spending levels which the non-custodial parent "consistently chose to provide for his children throughout their life." *Id.* at 1365. Mannings looks to *de Guigne* for support here because "the parents agreed on a certain lifestyle for their children while they were sharing a household."

Mannings' reliance on *de Guigne* is misplaced. *de Guigne* was a marital dissolution proceeding in which the court was asked to award child support, **prospectively**. The court in *de Guigne* did not order the non-custodial parent to pay for any child support expenses incurred previously. In contrast to *de Guigne*, Mannings did not sue for prospective child support in the State Court Action, and the State court did not

make a prospective child support award in the Default Judgment. Mannings sued to recover monies which were due from Madkins before she went to the State court. The decision in *de Guigne* is absolutely consistent with the established rule stated in *Visness* and *Goosman* that, "without a preexisting court decree establishing the non-custodial parent's support duty, there is no outstanding right to reimbursement for child support." (citations omitted.) *In re Visness, supra*, 57 F.3d at 779. An award for child support only operates prospectively. *In re Marriage of Goosman, supra*, 26 Cal.App.4th at 844.

Based on established California law, Madkins' promise to provide housing and to pay one-half of the living expenses for Mannings and her children is irrelevant to any claims Mannings could otherwise assert on behalf of Shawnie under § 523(a)(5). Mannings' claim against Madkins may be in the nature of contract damages, but she had no right to seek reimbursement for retroactive child support in the State Court Action. Accordingly, this court cannot conclude that any part of the Default Judgment is nondischargeable as "child support" under Section 523(a)(5).

### The Court is Persuaded that Madkins Willfully and Maliciously Converted Mannings' Personal Property Under 11 U.S.C. § 523(a)(6)

11 U.S.C. 523(a)(6) provides an exception to discharge of any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Mannings contends that Madkins willfully and maliciously converted the diamond ring, the boat and the trailer and that her damage claim, as reflected in the Default Judgment, in the amount of $8,500, should be nondischargeable under § 523(a)(6).

Under California law, the elements of conversion are "the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages." *Thiara v. Spycher Brothers (In re Thiara)*, 285 B.R. 420, 427 (9th Cir. BAP 2002) quoting *Farmer's Insurance Exchange v. Zerin*, 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707, 709 (1997).

The Ninth Circuit has held that the "willful" element of § 523(a)(6) is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that

11

injury is substantially certain to result from his own conduct. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002). The "malicious injury" requirement is separate from the "willful" requirement. A "malicious" injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Id.* at 1146-47.

Clearly, the "willful and malicious" inquiry under § 523(a)(6) is quite different from the "wrongful conduct" standard for conversion under California law. Mannings argues that the Default Judgment establishes that her property was willfully and maliciously converted. However, the application of collateral estoppel to the determination of dischargeablility under 523(a)(6) is quite narrow. Collateral estoppel precludes the bankruptcy court from relitigating the issues of "willful and malicious" in a discharge proceeding "only if an examination of the record of the earlier proceeding satisfies the bankruptcy court that the issue was raised and litigated and that the resolution of the issue was necessary to the verdict in the prior case." *Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir. 1988). The Default Judgment awarded damages for the amount prayed in both of Mannings' conversion claims. Based thereon, this court can conclude that the essential elements of conversion under California law, and the amount of those damages, were necessarily litigated by the State court. However, this court must look to additional evidence to determine whether that conversion of property was "willful and malicious."

The court notes first that Mannings offered no direct evidence as to Madkins' motive or intent relating to the ring, boat and trailer. The testimony from which the court might infer Madkins' motive and intent was conflicting and ambiguous. For example, with respect to the diamond ring, Mannings testified that Madkins gave her the diamond ring for a birthday present on February 11, 2001. In contrast, Madkins testified that he had purchased the ring as an engagement ring for another woman, and that Mannings began wearing the ring after she found it on Madkins' dresser. Mannings testified that Madkins took the ring off of the kitchen counter while she was doing the dishes and told

12

1    her he was going to get the prongs tightened.  In contrast, Madkins testified that

2    Mannings threw the ring at him during an argument after she discovered it had been

3    purchased for another woman, and that Mannings never asked for it back before he took it

4    to the pawn shop.

5          The testimony with regard to the boat and trailer was equally conflicting.

6    Mannings testified that she provided the money to purchase the boat and trailer before she

7    moved into Madkins' house in late January 2002, and that Madkins allowed her to store

8    the boat and trailer beside his house.  Mannings testified that the boat and trailer

9    disappeared from the house in June 2002; Madkins told her he had taken them to be

10   serviced.  Madkins testified that he obtained the funds for the boat and trailer from

11   another source, but he was unable to produce any documentation to corroborate his

12   testimony.  Conversely, Mannings did produce two California Certificates of Title for the

13   boat and trailer, which were issued on December 27, 2002, months after the boat and

14   trailer disappeared.

15         The testimony itself is inconclusive as to the "willful and malicious" nature of the

16   conversion claim.  However, Mannings only needs to prove her case by a preponderance

17   of the evidence and there is one other aspect of this case that leads the court to the

18   conclusion that Mannings' version of the story is more believable; that is the events

19   surrounding the Restraining Order.  After Mannings and her children moved out of the

20   house, she went back to court through a domestic violence proceeding and obtained the

21   Restraining Order which expressly prohibited either party from disposing of the diamond

22   ring, the boat, or the trailer.  The evidence suggests that Madkins pawned the diamond

23   ring about 13 days later.  He subsequently filed pleadings with the State court which

24   stated that the diamond ring had been sold months earlier.  Mannings apparently pawned

25   the diamond ring in blatant disregard for the Restraining Order and then intentionally

26   misrepresented his actions to the State court.

27         The Default Judgment itself supports the conclusion that Madkins converted the

28   diamond ring, the boat and the trailer, causing damage to Mannings in the amount of

13

$8,500. If Madkins pawned the diamond ring after the State court ordered him not to, and intentionally then misrepresented the status of the ring to the State court, then this court can infer that Madkins' testimony lacks credibility and that he pawned the ring with the knowledge and intent to prevent Mannings from having the ring. His actions in violation of the Restraining Order were intentional, wrongful, injurious to Mannings, and without any apparent justification or excuse. If Madkins intended to dispose of Mannings' ring willfully and maliciously, then the court can infer as well that he willfully and maliciously disposed of the boat and trailer. Knowing that Mannings had paid for them or claimed some property interest in them.

**The Attorney's Fees Awarded in the Default Judgment is Dischargeable.**

Mannings contends that the attorney's fees awarded in the Default Judgment should also be excepted from discharge under § 523(a)(5). Bankruptcy courts may determine that an award of attorney's fees is nondischargeable if the fees relate to the recovery of a debt which is in the nature of a child support obligation. However, where an award for attorney's fees does not relate to the recovery of a debt which is in the nature of a child support obligation, such an attorney's fees award is dischargeable. *In re Gibson*, 103 B.R. 218 (9th Cir.BAP 1989). As discussed above, Mannings sought the attorney's fees in each cause of action in the State Court Complaint; she did not seek attorney's fees solely in connection with the support claim. The Default Judgment does not assign or connect the attorney's fees award to any particular theory of recovery and the court has concluded that the "child support" claim was without merit. Accordingly, the attorney's fees award is also dischargeable.

**Conclusion**.

Based on the foregoing, the court finds and concludes that Mannings is not a person entitled to relief under 11 U.S.C. § 523(a)(5). To the extent Mannings seeks reimbursement of child support on behalf of Shawnie, that child support claim was not perfected under applicable State law. With regard to Mannings' conversion claim relating to the diamond ring, the boat and the trailer, the court is persuaded that the

14

property was willfully and maliciously converted by Madkins and that Mannings was damaged in the amount of $8,500.  The conversion portion of Madkins' debt to Mannings under the Default Judgment, in the amount of $8,500, is nondischargeable under 11 U.S.C. § 523(a)(6).  Mannings is entitled to recover her costs of suit, plus post-judgment interest on the nondischargeable award, at the State rate of 10%, computed from entry of the Default Judgment on December 3, 2003.

Dated:    December ___21___, 2005

W. Richard Lee
United States Bankruptcy Judge

15

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**CERTIFICATE OF MAILING**

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

Office of the US Trustee
1130 O St. Room 1110
Fresno, CA 93721

Barbara Harris
1522 18th St #203
Bakersfield, CA 93301

Robert Williams
2441 G St
Bakersfield, CA 93301

Charlotte Mannings
1522 18th St #203
Bakersfield, CA 93301

Keith Madkins
1304 REESE AVE
BAKERSFIELD, CA 93307

Rossana Zubrzycki-Blanco
1331 L St
Bakersfield CA 93301

DATED: 12-21-05                   By: _Tamara Joaquin_
                                      Deputy Clerk

EDC 3-070  (New 4/21/00)